GEORGE BROOMFIELD, receiver, vs. JOSEPH KOSOW
& others.

Suffolk.    October 5, 1965. — December 15, 1965.

Present: SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL,
& REARDON, JJ.

*Fiduciary.    Trust,* Constructive trust.    *Unjust Enrichment.    Fraud.    Evidence,* Extrinsic affecting writing.    *Restitution.    Interest.*

In view of previous relations between a lender and a borrower, of trust and confidence reposed in the lender by the borrower, and of other circumstances, where it appeared that the borrower was in need of financing for building construction, that the lender arranged for a construction contract between the borrower and a contractor acting for and under the control of the lender at a contract price which both the lender and the contractor knew was far in excess of the prospective cost of the work, that the lender thereupon made a loan to the borrower in the amount of the construction contract price and received secured notes therefor, that subsequently the lender procured payment of such amount by the borrower to the contractor and by the contractor to himself, the lender, and that the lender, after defraying construction costs in a total of less than one-half of such amount, retained the balance thereof without accounting to the borrower as he had promised to do, it was held that the lender was a fiduciary with respect to the borrower and held the retained balance on a constructive trust for the borrower. [757–758]

The parol evidence rule did not preclude consideration of evidence that the execution of a written contract was induced by a verbal fraudulent misrepresentation made prior to the time of execution but still operative at that time.    [758–759]

A lender of money to finance building construction, who, in the circumstances, after procuring payment of the loaned money by the borrower to the building contractor and by the contractor to himself, the lender, and defraying the costs of construction out of the money, was adjudged to be a constructive trustee of a substantial remaining balance for the borrower, and who also received the benefit of interest paid by the borrower on the loan, must make restitution to the borrower of such balance, with interest thereon from the date of the loan, and also the total of interest paid by the borrower on such balance, with interest on such total interest from the date of the last payment of interest.    [759]

BILL IN EQUITY filed in the Superior Court on April 4,
1963.

The suit was heard by *Forte,* J.

*Arthur T. Wasserman* for Kosow & another.

*Hertz N. Henkoff* (*George Broomfield* with him) for the plaintiff.

REARDON, J. This is a suit originally brought by the plaintiff as receiver of Dr. McCarthy's Rest Home, Inc. (the Home) seeking to establish a trust on certain funds alleged withheld or diverted by the defendant Leon Gordon in excess of the cost of construction work performed by him at the Home and for an accounting. Other defendants were Joseph Kosow and Industrial Small Business Investment Corp. (Investment Corp.). Following trial before a judge of the Superior Court, the plaintiff was given leave to amend his bill to conform with proposed findings, rulings, and an order for decree. The plaintiff filed an amended bill which sought to impress the trust on certain monies held by Kosow. Thereafter the judge made findings of material facts, rulings, and an order for a decree. The final decree required Kosow to pay to the plaintiff a sum computed by the judge, with interest from the date of entry of the original bill of complaint. The bill was dismissed as to the defendants Gordon and Investment Corp. Both the plaintiff and Kosow appealed.

The judge made findings as follow. The plaintiff is by a Superior Court appointment the receiver of the Home, a corporation operating a nursing home in Cambridge. Dr. Frank C. Romano was the owner of all the capital stock of this corporation and was in addition the owner of all the capital stock of five other corporations, also operating as nursing homes. In each of the six corporations he was president, treasurer, and a director. The defendant Kosow was a principal stockholder in charge of the operation of the defendant Investment Corp. This latter corporation was licensed under the Federal Small Business Investment Act. The nursing homes owned and operated by the six corporations had an approximate total of 400 beds and a gross annual revenue running between $750,000 and $850,000. For approximately two years prior to January,

1960, Romano and his corporations had from time to time borrowed from the defendant Kosow and from "entities in which he was interested." Kosow had studied the Romano operations intensively and "had intimate, personal, first-hand knowledge" of their condition. There was a close business relationship and friendship between Romano and Kosow. In 1958 the Romano corporations had borrowed jointly and severally $700,000 from Court Street Venture No. 1 (the Venture) in which Kosow was a participant. For that loan they had executed a note in the sum of $1,292,084.67 secured by mortgages on all of the real estate owned by the Romano corporations.

In January, 1960, the Home did not meet the standards of the Massachusetts Departments of Public Safety and Public Health, and to obtain compliance the departments requested alterations and additions. At about the same time, being unable to procure bank financing, Romano "sought out Kosow for the financing and building" both because of the departments' request and because he wished to build an addition to the Home in order that its volume of business might be increased by extra rooms. Kosow offered to survey the situation and to obtain a contractor "who would build the addition at the best possible price" with the cost of construction to be met by a loan from a Kosow operated finance company. Kosow and his associate Gordon then made a plan of the facilities of the Home with a view to complying with the departments' standards, and Kosow eventually informed Romano that he had a contractor (Leon Gordon) who would construct the addition for $141,661 "well knowing that the entire work of addition and alteration would cost not more than $75,000 and possibly $80,000." Leon Gordon, one of the several defendants, had an office in a suite maintained by Kosow and was engaged in general construction, as well as being an associate of Kosow in the operation of nursing homes. Kosow and Gordon presented the preliminary plans to Romano, and Kosow told Romano that in the event the total construction cost was less than $141,661 he would give

Romano a "breakdown." He "led Romano to understand that he would give an accounting to Romano at the conclusion of the work and give Romano, that is Dr. McCarthy's Rest Home, Inc. credit for the excess." Romano told Kosow that his proposition was satisfactory and that he should proceed to final plans and specifications, including arrangements for financing and preparation of the necessary documents. In February, 1960, Kosow engaged a lawyer to prepare an agreement between Romano, Romano's wife, the Home, and Gordon as contractor for the building of the addition. On June 15, 1960, the parties executed formal written contracts for the proposed construction. Concurrently Romano, for each of the six Romano corporations, executed and delivered six notes and six real estate mortgages securing the notes representing the loans from the defendant Investment Corp., which instruments had been prepared by still other counsel retained by Investment Corp. Three of these notes were for $30,000, two for $20,000, and a sixth for a lesser amount. Checks from Investment Corp. in the amount of the respective loans to each of the Romano corporations were given to Romano and he immediately indorsed each one over to Gordon. Gordon deposited them after indorsement in his own bank account but five days thereafter, on June 20, 1960, he drew a check on his bank in the amount of $141,661, the total amount of the loans, payable to the Sherman Kosow Family Venture. That check was deposited to the credit of the Sherman Kosow Family Venture in the City Bank and Trust Company. The rate of interest on each of the several loans to Romano's corporations was fifteen per cent per annum. At the time the loans were made there was in existence a government regulation prohibiting a loan as large as $141,661 from Investment Corp. to any single borrower.

The work required by the construction contract was performed satisfactorily, and as it progressed either Gordon paid its cost and was reimbursed by the Sherman Kosow Family Venture, or payment was made directly by it.

Kosow made arrangements for all subcontracts. The cost of the construction work was $63,124.35, representing all payments made by or through the defendant Gordon from the proceeds of the six loans. This did not include any overhead or profits charge for Gordon, Kosow, or others who worked on the project, and no payment for any such items was ever requested.

"Romano relied on the good faith of Kosow in placing the $141,661 in Kosow's hands for disbursement to Gordon and others in accordance with the terms of the contract." Despite his promise to give an accounting, Kosow never disclosed to Romano what happened to the funds after they were given over to Gordon as Kosow's agent. In the spring of 1961 Romano delivered to Kosow a letter prepared for Romano's signature by an attorney. The letter stated Romano's satisfaction with the size of certain interest charges.

Gordon was at all times acting for, and under the direction and control of, Kosow. Gordon was aware from the first that the cost of the work would be approximately $63,000, but under the direction of Kosow he signed a contract for $141,661, subsequently turning the entire amount over to Kosow. He was paid $63,124.35 in full by Kosow, and there was no fiduciary relationship between him and Romano or the Home.

In addition to the findings of the judge, facts stipulated by the plaintiff and the defendant Kosow indicated that on November 13, 1961, the balance due on the six mortgage notes was $129,661, and no further payments were made thereon by any of the Romano corporations. It also appears that between June 15, 1960, and November 13, 1961, interest was paid. Kosow sold his holdings and resigned from all positions in Investment Corp. on June 29, 1961. On November 27, 1961, Investment Corp. sold the six notes and mortgages to Congress Management Corp. for an amount equal to the then balance, thus wholly reimbursing itself. Congress Management Corp. simultaneously sold the notes to the Venture for $50,000 in cash and a promis-

sory note for $79,661. The Venture sold them to one Barney Goldstein on the same date for his note in the amount of $129,661. A foreclosure of the mortgages ensued in the last week of March and the first week of April, 1962, when the equities in the properties were sold to Barney Goldstein for $2,500 each. The sale resulted in gross deficiencies in the sum of $122,062 plus foreclosure costs. These remain unpaid. Title to the mortgaged nursing homes was eventually acquired by Geriatric Services, Inc.

The judge found that in connection with the making of the loans and the construction of the addition Romano reposed trust and confidence in Kosow and that the influence growing out of that trust and confidence was "exerted" by Kosow "to obtain a personal advantage at the expense of Romano and his enterprises." The judge rejected Kosow's contention that this was an open contract openly arrived at in which Kosow made an offer to do all the work required for $141,661. On the contrary, the judge found that Romano placed complete faith in Kosow, entrusting him with the entire project, and signed all documents including notes, contracts and mortgages submitted to him by Kosow without questioning or examining them in any way, trusting Kosow implicitly and doing the latter's bidding throughout the undertaking. He found further that Romano was never given any breakdown or accounting and knew nothing of the details of the construction loans and that Kosow "sought to make as handsome a profit as he could, without disclosing the details to Romano."

1. The principal issue is whether the findings of the judge establish the elements essential to create a constructive trust. We apply the familiar rule on the duty of this court where there is an appeal from a final decree upon findings of material facts made by the trial judge with a full report of the evidence. *Berman* v. *Coakley,* 257 Mass. 159, 162. *Willett* v. *Willett,* 333 Mass. 323, 324. *Freitas* v. *Freitas, ante,* 276, 277. In his findings of fact the judge was not plainly wrong. We thus reach the main issue.

Kosow has strongly urged that the relationship between him and Romano was "purely a business one" and that therefore it "falls far short of being fiduciary." Yet, in his own brief, he has cited *Warsofsky* v. *Sherman,* 326 Mass. 290, in which the court noted regarding fiduciary relationships that "it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case" (p. 292).

Let us consider Kosow's contentions. He has suggested that since Romano sought him for financing, since Romano was a businessman, and since there was a business friendship between Romano and himself, their relationship could not be fiduciary in character. He relies on cases where this court has held certain business relationships not to be fiduciary. See *Comstock* v. *Livingston,* 210 Mass. 581, 584; *Cranwell* v. *Oglesby,* 299 Mass. 148, 152, 153; *Snow* v. *Merchants Natl. Bank,* 309 Mass. 354, 360; *Plumer* v. *Luce,* 310 Mass. 789, 798–799; *Yamins* v. *Zeitz,* 322 Mass. 268, 272; *National Shawmut Bank* v. *Hallett,* 322 Mass. 596, 602–603; *Rockland-Atlas Natl. Bank* v. *Barry,* 336 Mass. 220, 223. Kosow has argued from these cases that when business is the basis of the parties' relationship, mutual respect and confidence cannot make their relation a fiduciary one. A reading of these cases, however, will indicate that they stand for the principle that the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. The catalyst in such a change is the defendant's knowledge of the plaintiff's reliance upon him. In redressing an abuse of trust and confidence equity will review such factors as the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge. Equity will, in sum, weigh whether unjust enrichment results from the relationship.

Bogert, Trusts and Trustees (2d ed.) § 481, points out that in many representative social and business relation-

ships there is "no special intimacy or great degree of trust and confidence" but in certain of them "great intimacy" is the rule because of knowledge by one party of the business and family affairs of another. He adds that equity has continued to take an "active interest in the fostering and protection of these intimate relationships which it calls 'fiduciary.'" He stresses that the exact limits of the term "fiduciary relation" are difficult to ascertain, that equity refuses to bind itself by an all inclusive definition, and that it reserves entire freedom to declare relationships to be fiduciary upon the particular facts of each case. He emphasizes, too, the importance of great disparity of position. Scott, Trusts (2d ed.) § 468. Restatement: Restitution, § 166.

In a much cited quotation, from *Tate* v. *Williamson,* [1866] L. R. 2 Ch. 55, where the defendant failed to disclose to a young relative whom he was advising on financial problems that land which the defendant was about to purchase from the relative had been found to be more valuable than both of them originally thought, Lord Chelmsford stated that "openness and fair dealing were the more necessary when he was negotiating with an extravagant and necessitous young man, deprived at the time of all other advice, eager to raise money, and apparently careless in what manner it was obtained; and the Defendant having, by concealment of a valuation which he had privately obtained, procured a considerable advantage in the price which the seller was induced to take . . . he cannot be permitted so to turn the confidence reposed in him to his own profit, and the sale ought to be set aside" (pp. 66–67).

In *Reed* v. *A. E. Little Co.* 256 Mass. 442, officers of the defendant company had long advised an aged plaintiff in the handling of his patents. One of them, holding himself out as a friend, prevailed upon the plaintiff to dispose of the patents in a manner which was of harm to him and of benefit to the defendant. The court said, "In the case at bar the parties did not deal at arm's length. . . . When confidence is reposed and accepted, the person trusted is

liable for expressing dishonest opinions upon which the other party relies and acts to his damage . . ." (p. 449). Similar in result was *Cann* v. *Barry,* 293 Mass. 313, cited by the trial judge in his findings. See also *Grand Trunk Western R.R.* v. *Chicago & Western Indiana R.R.* 131 F. 2d 215, 219 (7th Cir.); *Knight Newspapers* v. *Commissioner of Int. Rev.* 143 F. 2d 1007 (6th Cir.); Pound, The Progress of the Law, 33 Harv. L. Rev. 420; Scott, Trusts, § 462.2; Restatement: Restitution, § 201.

We now examine the relation between Romano and Kosow in the light of the foregoing. For two years prior to January, 1960, Romano and his corporations had borrowed from Kosow and his business interests. Kosow, from intensive study of the Romano nursing homes, had obtained "intimate, personal, first-hand knowledge" of them. There was a close business relationship and business friendship between the two men. Kosow, upon Romano's suggestion, volunteered to survey the situation and obtain a contractor for him. The contractor whom Kosow chose had an office in Kosow's suite. Kosow told Romano that the addition would cost approximately $140,000 when he knew it would cost at least $60,000 less. He promised Romano an accounting at the conclusion of the work, which he never gave him. All documents signed by Romano for the nursing homes were prepared by counsel retained by Kosow. Gordon was at all times under Kosow's direction and control. Romano relied on Kosow's good faith in placing the proceeds of the loans in his hands and Kosow did not disclose to him where these proceeds were eventually deposited. Gordon knew that the cost of the addition would be in the neighborhood of $63,000 but, acting under the direction of Kosow, nevertheless signed a contract for $141,661. In all of these negotiations and transactions Romano, who was untutored in construction costs and indeed in much of the business which he transacted, trusted and confided in Kosow who "exerted" the influence springing from that trust and confidence to obtain personal advantage at the expense of Romano and his nursing homes.

This was not an arm's length transaction but one which the judge rightly found to be a fiduciary relationship carrying with it all the consequences of such a relationship. As Judge Cardozo once put it, "When property has been acquired in such circumstances that the holder of the legal title may not in good conscience obtain the beneficial interest, equity converts him into a trustee." *Beatty* v. *Guggenheim Exploration Co.* 225 N. Y. 380, 386.[1]

The facts established in this case are indicative of an unjust enrichment of Kosow arising out of the abuse of a relationship of trust and confidence with Romano. The remedy sought in the bill, imposition of a constructive trust, is amply warranted.

2. Kosow moved that, in view of the parol evidence rule, part of Romano's testimony of his conversation with Kosow prior to the execution of the contract be struck. The trial judge denied Kosow's motion and Kosow now argues that, in the absence of any fraud and deceit inducing the execution of the contract, evidence of the oral agreement is not admissible to vary its terms. Kosow has argued that since the judge made no finding that he had practised fraud at the precise time that the contract was signed, oral statements should not have been admitted to vary the contract's terms. The argument is not sound. Prior to the signing of the contract Kosow had represented that the cost of construction would be over $60,000 in excess of what it really was. This would justify a finding of fraud. At the time

---

[1] Compare *Salter* v. *Beal*, 321 Mass. 105, 108. The citations there considered were authority "for the proposition that a mere engagement to buy in behalf of another without more is not deemed in this Commonwealth to create a fiduciary relation." See *Cann* v. *Barry*, 293 Mass. 313, 316, where it was said, "It is settled in this Commonwealth that no implied or constructive trust arises merely because the defendant has agreed orally to buy land as the plaintiff's agent and then has repudiated the obligation and kept the land for himself." It was also emphasized that "[t]he circumstances which may create a fiduciary relationship are so varied and so difficult to foresee that it is unwise for courts to make comprehensive definitions." There the statute of frauds was not allowed to stand in the way of the imposition of a constructive trust where the undertaking by the defendant was to purchase land. Cf. *Ries* v. *Rome*, 337 Mass. 376. See *Berenson* v. *Nirenstein*, 326 Mass. 285, 289, where the court said that the "full and complete relation of principal and broker" had existed and was distinguishable from the relationship in the *Salter* case and its authorities.

of the execution of the contract that misrepresentation was still operative, even if the fraud took place prior to the contract's execution. *Bates* v. *Southgate,* 308 Mass. 170, 182, specifically abolished the time distinction which Kosow now attempts to establish. Fraud involved in the contract may be proved by extrinsic evidence and, hence, the trial judge did not err in denying Kosow's motion to strike.

3. Review of the record shows no ground for placing liability on the defendants Gordon and Investment Corp.

4. The loan was $141,661. The cost of satisfactory construction of the addition was $63,124.35. Kosow is constructive trustee for the difference of $78,536.65 which it is not disputed he received, and he must pay that amount to the plaintiff. He is to pay six per cent interest on that sum from June 15, 1960, until the entry of the final decree following this rescript.

Since Kosow was to be a mere money lender he is not entitled to an award of expenses. Kosow, in appropriating the difference between the cost of construction and the amount of the loan, received the benefit of the payment of interest on that sum. To afford complete relief to the plaintiff, Kosow must make restitution of the amount of interest paid on the $78,536.65 from June 15, 1960, to November 13, 1961; on that sum Kosow is to pay six per cent interest computed from November 13, 1961, until the entry of the final decree following this rescript. *Alden Bros. Co.* v. *Dunn,* 264 Mass. 355, 363. *Hubrite Informal Frocks, Inc.* v. *Kramer,* 297 Mass. 530, 535. *Yurkanis* v. *Yurkanis,* 321 Mass. 375, 379–380.

The final decree is to be modified to conform to this opinion with respect to the amount with which Kosow is chargeable and, as modified, is affirmed with costs of appeal to the plaintiff.

*So ordered.*